UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| AMBER ALVEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 8:15-cv-01861-VCM-MAP |
| | ) | |
| SHERIFF BOB GUALTIERI, | ) | |
| in his official capacity as Sheriff of | ) | |
| Pinellas County, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA

INTRODUCTION

Amber Alvey is 60 years old and has many physical disabilities. *See infra* at 3-4.

Shortly after midnight on June 20, 2014, Ms. Alvey was admitted to Pinellas Safe Harbor

("PSH"), a county shelter that serves homeless individuals. *Id.* She requested a standard bed (17

inches high) because she could not get up and down from a floor mat unassisted, but she was

instead assigned to sleep on an elevated floor mat (10 inches high). *Id.* That evening, PSH staff

told Ms. Alvey to come outside for a resident count, and she fell and injured herself while trying

to stand up from the elevated floor mat. *Id.* While she was being treated at a nearby hospital,

PSH staff decided that Ms. Alvey was "medically unfit" for PSH and banned her indefinitely

from staying at PSH. *Id.*

Ms. Alvey filed a complaint alleging that PSH had violated Title II of the Americans with

Disabilities Act ("Title II" or "ADA"), 42 U.S.C. §§ 12131-12134, which prohibits public

entities like PSH from discriminating on the basis of disability. PSH's primary response is that it

1

did not discriminate on the basis of disability because "for 20 hours . . . Alvey had meaningful access to the same free sheltered amenities" as the other residents at PSH.  Def.'s Mot. for Summ. J. & Mem. ("Def.'s MSJ") at 1 (ECF 50).  PSH also argues that Ms. Alvey did not make a "specific demand for an accommodation." *Id.* at 15 (internal quotation marks omitted).

Because there appears to be confusion in the briefing as to the requirements that Title II and its implementing regulation, 28 C.F.R. Part 35, impose on public entities like PSH, the United States respectfully submits this Statement of Interest to clarify (1) PSH's obligations under Title II during Ms. Alvey's initial 20-hour stay, (2) PSH's obligations under Title II when Ms. Alvey attempted to return to PSH, and (3) the sufficiency of Ms. Alvey's request for a reasonable modification.

In enacting the ADA, Congress found that individuals with disabilities continually encounter discrimination in access to public services, including both outright intentional exclusion and the failure to make modifications to existing practices.  42 U.S.C. § 12101(a)(3), (a)(5).  Shelters that serve the homeless provide critical services to individuals with disabilities; as PSH notes, 30% of its residents in 2014 had disabilities.  *See* Def.'s MSJ at 3.  Thus, it is imperative that such shelters have clear guidance about their obligations under the ADA.  *See* 42 U.S.C. § 12101(b)(2) (the purpose of the ADA is to provide "clear, strong, consistent, enforceable standards" to combat discrimination on the basis of disability).  As the agency mandated to enforce the ADA and to promulgate the Title II regulation, the United States Department of Justice ("DOJ") has a particularly strong interest in this matter.  *See* 28 U.S.C. § 517 (the Attorney General may send any officer of the Department of Justice "to attend to the interests of the United States in a suit pending in a court of the United States . . . .").

2

## FACTS

The following facts are drawn from the parties' summary judgment briefing.  Amber Alvey is 60 years old and has many mobility and physical disabilities.  Plf.'s Mot. for Partial Summ. J. ("Plf.'s MSJ") ¶ 3 (ECF 49); *see* Def.'s MSJ ¶ 22.  Ms. Alvey was admitted to Pinellas Safe Harbor, a shelter that serves homeless individuals, shortly after midnight on June 20, 2014.  Plf.'s MSJ ¶¶ 8-9, 21; Def.'s MSJ ¶¶ 1-3, 21.

The sleeping arrangements at PSH consist of bunk beds, floor mats, and a combination of a floor mat and a "boat."  Plf.'s MSJ ¶ 27; Def.'s MSJ ¶ 11.  The bottom bed of a bunk bed is raised 17" from the ground, and a person can grasp the metal frame while standing up or lying down; a "boat" – a plastic frame for a floor mat – raises the floor mat about 10" from the ground and has no handholds to grasp.  Plf.'s MSJ ¶¶ 28-29. 33; Def.'s MSJ at 17; *see also* Plf.'s Opp. to Def.'s MSJ (ECF 64) at 17.[1]  During intake, Ms. Alvey informed PSH staff that she had a disability and "could not sit/lay down on a mat without assistance."  Plf.'s MSJ, Ex. 10-C at 20 (Def.'s Verified Interrog. Resp. #2) (ECF 49-14).  She then requested a bed.  *Id.* (Def.'s Verified Interrog. Resp. #3).  Instead, she was assigned a boat and a floor mat.  Plf.'s MSJ ¶ 32; Def.'s MSJ ¶ 25.  Ms. Alvey testified, and PSH has not disputed, that she later asked PSH staff about using one of the bunk beds that did not appear to be in use.  Plf.'s MSJ ¶ 32; Def.'s MSJ at 16.

Around 8 p.m. on the same day, PSH staff ordered residents to go outside for headcount, and Ms. Alvey fell while trying to get up from her boat.  Plf.'s MSJ ¶¶ 38-39; Def.'s MSJ ¶¶ 30-31.  She was taken to and treated at a local hospital.  Plf.'s MSJ ¶ 40; Def.'s MSJ ¶ 32.  While she was being treated at the hospital, PSH staff decided that PSH was "not conducive to the

---

[1] The Department of Justice has issued technical assistance for temporary emergency shelters stating that accessible cots must be at least 17" from the ground.  Dep't of Justice, *Americans with Disabilities Act, Checklist for Emergency Shelters* (July 26, 2007), *available at* https://www.ada.gov/pcatoolkit/chap7shelterchk.htm.

medical needs of [Alvey]," and checked her out of the facility at 9:43 p.m.  Plf.'s MSJ ¶¶ 41-43; Def.'s MSJ ¶ 33.  Ms. Alvey was discharged from the hospital shortly after midnight on June 21, and attempted to return to PSH.  Plf.'s MSJ ¶¶ 40-41; Def.'s MSJ ¶ 34.  Ms. Alvey testified that she was told she was not allowed on the property.  Plf.'s MSJ ¶ 42; Def.'s MSJ ¶ 35.  PSH records reflect that Ms. Alvey was told that she was "not fit for the facility" and had been "deemed medically unfit," although one PSH record also states that Ms. Alvey was told she could stay at PSH's outdoor area (typically used in the summer for residents with discipline problems) until senior staff "cleared her."  Plf.'s MSJ ¶¶ 41-43, 46; Def.'s MSJ ¶¶ 6, 39-40; Def.'s MSJ, Ex. 16 (ECF 51-25) at 69; Def.'s MSJ, Ex. 10 (ECF 51-10) at 105-108.  Ms. Alvey ultimately spent the night at a bus stop across the street.  Plf.'s MSJ ¶ 48; Def.'s MSJ ¶ 37. Ms. Alvey states, and PSH has not disputed, that she is now banned from PSH because she was deemed "medically unfit" for the facility.  Plf.'s MSJ ¶¶ 41, 49; Def.'s MSJ, Ex. 16 (ECF 51-25) at 69.

## STATUTORY AND REGULATORY BACKGROUND

Under Title II of the ADA, a public entity cannot "den[y] the benefits of [its] services, programs, or activities" to a qualified individual with a disability, or subject any such individual to discrimination.  42 U.S.C. § 12132.  The DOJ has promulgated a regulation implementing Title II.  *Id.* § 12134; 28 C.F.R. Pt. 35.  The regulation states that a public entity may not (1) "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from [its] aid, benefit, or service," 28 C.F.R. § 35.130(b)(1)(i); (2) "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from [its] aid, benefit, or service that is not equal to that afforded others," *id.* § 35.130(b)(1)(ii); or (3) provide a qualified individual with a disability "with an aid, benefit, or service that is not as effective in affording equal opportunity to . . . gain the same benefit" as a person without disabilities, *id.*

4

§ 35.130(b)(1)(iii).  To achieve these objectives, the regulation requires a public entity to "make reasonable modifications in policies, practices, or procedures when . . . necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

The regulation at 28 C.F.R. § 35.130 is entitled to "substantial deference."  *Blum v. Bacon*, 457 U.S. 132, 141 (1983); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597-98 (1999) (deferring to DOJ's interpretation of Title II as implemented by the regulation).

## DISCUSSION

To make out a claim under Title II, Ms. Alvey must show that (1) she is a qualified individual with a disability, (2) she is denied the benefits of or excluded from the services or activities of PSH, a public entity, and (3) the exclusion or denial is by reason of her disability. *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1083 (11th Cir. 2007).  A "qualified" individual is one who, "with or without reasonable modifications . . . meets the essential eligibility requirements for the receipt of services or the participation in the program[] . . . provided by a public entity."  42 U.S.C. § 12131(2).  An exclusion or denial is by reason of disability if a reasonable modification exists that would allow the individual to participate in the services or activities.  *Bircoll*, 480 F.3d at 1081-82 & n.13.

If Ms. Alvey shows that the requested modification was "reasonable in the general sense, that is, reasonable in the run of cases," *Alumni Cruises, LLC v. Carnival Corp.*, 987 F. Supp. 2d 1290, 1305-06 (S.D. Fla. 2013); *Alboniga v. Sch. Bd. of Broward Cty. Fla.*, 87 F. Supp. 3d 1319, 1336 (S.D. Fla. 2015), PSH would have the burden to show, as an affirmative defense, that the requested modification would create a "fundamental alteration" in its program or service.  *Id.*;

5

*see also* 35 C.F.R. § 35.130(b)(7).  The court must conduct an individualized inquiry, taking into account the circumstances surrounding the plaintiff, the defendant, the program, and the requested modification, to determine whether the proposed modification is reasonable or would create any fundamental alteration.  *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001).

Whether Ms. Alvey's requested modification was reasonable, and whether PSH can establish that the modification would have created a fundamental alteration, are fact-intensive questions on which the United States takes no position in this Statement.  Instead, the Statement will outline the general principles of law that are applicable.

A.  Ms. Alvey's Participation in PSH's Programs and Services

PSH's primary argument is that it fulfilled all of its obligations under the ADA because Ms. Alvey spent "20-hours eating meals, sleeping on her boat, and having full access to her medication, bathrooms and meeting with a caseworker" at PSH before being indefinitely banned after injuring herself.  Def.'s MSJ at 9; *see also id. at* 17-19.  For the reasons explained below, this misstates a public entity's obligations under the ADA.

1.   *PSH Was Obligated To Provide Ms. Alvey With "An Equal Opportunity" To Benefit From A Safe Shelter As Residents Without Disabilities*

As noted, under the ADA, a public entity cannot provide a qualified individual with a disability "with an aid, benefit, or service that is not as effective in affording equal opportunity to . . . gain the same benefit" as a person without disabilities.  28 C.F.R. § 35.130(b)(1)(iii).  A "qualified" individual is one who meets the entity's essential eligibility requirements, with or without a reasonable modification.  When a reasonable modification provides the individual with a disability with an "equal opportunity to . . . gain the same benefit," it provides "meaningful access."  *See Alexander v. Choate*, 469 U.S. 287, 301 (1985).

As PSH explains, one of PSH's benefits is providing residents with a "*safe* shelter." Def.'s Opp. to Plf.'s MSJ (ECF 65) at 2.  Under 28 C.F.R. § 35.130(b)(1)(iii), then, PSH had to provide qualified residents with disabilities the same opportunity to have a "safe shelter" as residents without disabilities.  Ms. Alvey told PSH that she needed a lower bunk bed because she physically could not get up and down from a floor mat herself.  If being assigned instead to 10" high plastic boat with no bars to grasp, rather than a 17" high bed with a metal frame, put Ms. Alvey in an unsafe situation, she did not have "an equal opportunity to . . . gain the same benefit" from PSH's programs as residents without disabilities.[2]

Courts have repeatedly recognized ADA claims when a qualified individual with a disability was put in an unsafe situation, or otherwise caused "greater injury or indignity than" people without disabilities, after a public entity failed to make reasonable modifications. *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir.), rev'd in part on other grounds, *City & Cnty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765 (2015).  For instance, the Eighth Circuit held that an individual who used a wheelchair had stated a claim under the ADA where he was transported in a non-wheelchair-accessible vehicle.  *Gorman v. Bartch*, 152 F.3d 907, 913 (8th Cir. 1998).  The court explained that the transportation had caused injury and been humiliating, and that "[t]he 'benefit' [plaintiff] sought . . . was to be handled and transported in a safe and appropriate manner consistent with his disability."  *Id.* (citing 28 C.F.R. § 35.130(b)(1)).  Similarly, in a case involving unsafe transportation of a person in a wheelchair to medical services, a court explained that:

---

[2] PSH argues that a boat was just as safe for Ms. Alvey as a bed would have been, citing her medical records to show that Ms. Alvey had fallen from a standard bed.  Def.'s MSJ at 18.  The cited medical records show, however, that Ms. Alvey fell once in 1.5 years from the standard bed, as opposed to once within less than a day from the boat.  *Id.*  This at least suggests that the boat was indeed less safe for Ms. Alvey than a bed would have been.

7

> Although plaintiff is not wholly precluded from participating in this service, if he is at risk of incurring serious injuries each time he attempts to take advantage of outside medical attention, surely he is being denied the *benefits* of this service. The plain language of the ADA demonstrate[s] that the statute was designed to ensure that disabled persons are neither denied access to, nor the *benefits* of services based on their disability.

*Allah v. Goord*, 405 F. Supp. 2d 265, 280-81 (S.D.N.Y. 2005); *see also Woods v. City of Utica*, 902 F. Supp. 2d 273, 281-82 (N.D.N.Y. 2012) (plaintiff stated ADA claim where "there is sufficient evidence in the record to permit a rational trier of fact to find that the County failed to provide a reasonable accommodation for [plaintiff's] disability, thereby causing greater injury or indignity than other arrestees endure"). It is not necessary that the individual actually suffer an injury, only that the person be at risk of "greater injury or indignity" than a person without disabilities. *See Bane v. Virginia Dep't of Corr.*, No. 12-159, 2012 WL 6738274, at *11, 15 (W.D. Va. Dec. 28, 2012) (citing § 35.130(b)(1) and holding that plaintiff stated ADA claim where he was forced to use a shower that posed a high risk of injury for him, unlike inmates without disabilities).

PSH argues that Ms. Alvey's request for a bed is a request for "preferential" treatment. Def.'s MSJ at 19. But a request for an *equal opportunity* to gain the same benefit from PSH's programs is, by definition, not a request for preferential treatment. The Eighth Circuit rejected a similar argument in *Gordon*, explaining that a request for "safe and appropriate transport" was "different from cases in which plaintiffs sought unique benefits or services," even though a special vehicle might be necessary to provide that safe and appropriate transport. *Gorman*, 152 F.3d at 913.

Thus, as the caselaw demonstrates, it is irrelevant whether PSH provided Ms. Alvey with *some* services if it also denied her a reasonable modification that would have allowed her a "safe and appropriate" bed. If Ms. Alvey can show that a reasonable modification would have given

8

her a safe sleeping situation, and PSH cannot establish a fundamental alteration defense, Ms. Alvey can demonstrate that PSH violated Title II by failing to give her an "equal opportunity to . . . gain the same benefit" from PSH's services as residents without disabilities.

> **2.      PSH Was Required To Consider Whether A Reasonable Modification Existed That Would Allow Ms. Alvey To Meet PSH's Medical Requirements**

PSH also argues that the permanent ban did not violate Title II because Ms. Alvey had already benefited from PSH's services and programs for 20 hours. *See* Def.'s MSJ at 17-19.[3] But whether Ms. Alvey had an opportunity to participate in PSH's services during her initial stay is irrelevant to the question of whether PSH violated Title II of the ADA when it banned her indefinitely. The two questions are analytically distinct and must be analyzed separately.

A public entity may not "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from [its] aid, benefit, or service" on the basis of disability. 28 C.F.R. § 35.130(b)(1)(i). Here, PSH banned Ms. Alvey because it deemed her "medically unfit" for the facility. PSH has a written policy that explains that, due to its limited staff, "all residents at Safe Harbor must be able to care for themselves, without assistance," and so PSH cannot care for "individuals who are unable to eat, sit down, walk or use the facilities without the assistance of another person." Plf.'s MSJ, Ex. 10-A (ECF 49-12) at 29. Thus, PSH argues that Ms. Alvey was not "qualified" under its medical criteria, and it was entitled to ban her.[4]

---

[3] In its opposition brief, PSH takes a different tack, arguing that Ms. Alvey voluntarily left PSH after returning from the hospital. But PSH does not dispute that it had already permanently banned Ms. Alvey (and the ban remains in effect today). See Def.'s Opp. to Plf.'s MSJ at 6-7.

[4] A separate regulatory provision, 28 C.F.R. § 130.35(b)(8), provides that a public entity "shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." PSH's criteria undoubtedly screen out individuals with disabilities. In arguing that its program nonetheless complies with

However, a "qualified" individual can be one who meets the public entity's eligibility requirements *with* a reasonable modification.  42 U.S.C. § 12131(2).  Thus, before concluding that Ms. Alvey was not a qualified individual and banning her from the facility as "medically unfit," PSH was required to consider whether Ms. Alvey could sit down without assistance, and thus meet its criteria, if she were provided the requested modification – namely, a lower bunk bed.  Here, there is no indication that anyone on the staff even considered whether the bed that she had repeatedly requested would make her "medically fit" for PSH.  *See Alexander v. Choate*, 469 U.S. 287, 301 (1985) ("The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.").

Hence, if Ms. Alvey can show that a reasonable modification would have made her "medically fit" to remain at PSH, and PSH cannot show that the proposed modification would have fundamentally altered its service, Ms. Alvey can establish that she was denied the opportunity to participate in PSH's services because of her disability.

---

§ 130.35(b)(8), PSH relies on the 28 C.F.R. § 35.135, which provides that public entities are typically not required to provide "services of a personal nature including assistance in eating, toileting, or dressing."  *See* Def.'s Opp. to Plf.'s MSJ at 12.  Even assuming this provision applies (*but see* 28 C.F.R. Part 35, App. B, noting that certain types of institutions may have to provide personal care), assisting someone with sitting down is a much less intensive task than assisting a person with toileting, eating, or dressing.  Thus, the few exceptions listed in 28 C.F.R. § 35.135 do not, by themselves, show that PSH may maintain a policy that it will not assist residents with sitting down.  However, the United States takes no position on whether, under the circumstances, PSH's staffing limitations mean that its criteria are "necessary for the provision of the service, program, or activity being offered."  As explained above, regardless of whether the criteria are "necessary," PSH was obligated to consider whether Ms. Alvey could meet the criteria with a reasonable modification.

10

B.  A Person Requesting a Reasonable Modification Need Not Use "Magic Words" Or Fulfill Any Formal Requirements

Finally, PSH argues that Ms. Alvey did not make a sufficiently "specific demand" for the reasonable modification of a bed.  Def.'s MSJ at 15.  The ADA does not require that a person make a request for a reasonable modification in any specific format, and consistent with this, the Eleventh Circuit has never "determined precisely what form the request must take." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1261 n.14 (11th Cir. 2007).

The Eleventh Circuit has not addressed the sufficiency of a request for a reasonable modification under Title II of the ADA, which governs public entities.  It has repeatedly addressed this question under Title I of the ADA, which governs employers, and under the Fair Housing Act.  The Title I and Fair Housing cases are instructive but not binding in the context of Title II.[5]  In this case, however, the difference between the Title I and Title II is immaterial, as Ms. Alvey's request was sufficient under any standard.

As the Eleventh Circuit has recognized, the key principle is that the defendant "must have enough information to know of both the disability and desire for an accommodation, or circumstances must at least be sufficient to cause a reasonable [defendant] to make appropriate inquiries about the possible need for an accommodation."  *United States v. Hialeah Hous. Auth.*, 418 F. App'x 872, 876 (11th Cir. 2011) (internal quotation marks and citation omitted).

---

[5]  Title I applies only to employment; Title II applies to *all* programs, services, or activities of state and local governments.  Thus, Title II covers a much broader range of situations than Title I, and implicates different concerns about putting the defendant on notice.  For example, it might not be reasonable to require inmates or arrestees with disabilities, or young schoolchildren with disabilities, to specifically request modifications.  *See, e.g.*, *Sheehan*, 743 F.3d at 1233 (holding that police officers were required to make reasonable modifications to account for arrestee's mental illness during arrest, although arrestee had not requested any modification); *Pierce v. D.C.*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015) (prison was required to affirmatively make modifications for deaf inmate, even if he did not "overcome [his] communications-related difficulties" to request modification).

However, there is no "magic words" requirement. *Id.* (internal quotation marks and citation omitted). The *Hialeah* court concluded that plaintiff had requested a reasonable accommodation where he told his landlord that he had a disability due to hip and back problems; he had difficulty going up and down stairs; and he did not want an apartment that lacked a first-floor bathroom. *Id.* at 877.

Ms. Alvey's request was very similar to the request in *Hialeah*. She informed PSH staff when she was admitted that she had a disability; said that she "could not sit/lay down on a mat without assistance"; requested a bed at that time; and requested a bed again later in the day. *See supra* at 3-4.[6] In other words, she both identified the problem and the desire for a modification, and she specified that a bed would be an appropriate modification. Thus, PSH staff had all the information they needed to consider Ms. Alvey's request. PSH now argues that providing a boat was an accommodation to Ms. Alvey, Def.'s MSJ ¶ 25, but it cites no evidence suggesting that PSH staff worked with Ms. Alvey to determine whether the boat – which was significantly lower than the bed and lacked bars to grasp – would provide her with a safe sleeping arrangement and therefore fulfill her request for a modification. *See Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001), as amended on denial of reh'g (Oct. 11, 2001) (public entity is "required to undertake a fact-specific investigation to determine what constitutes a reasonable

---

[6] PSH's opposition to Ms. Alvey's motion for summary judgment (ECF 65) appears to argue that its verified interrogatory responses, which state that Ms. Alvey requested a bed at intake, are incorrect. *Id.* at 1 (noting that Ms. Alvey relies on "interrogatories signed by the Sheriff's General counsel prior to the deposition testimony of 10 witnesses for the Sheriff that dispute Ms. Alvey's version of events"). But PSH cites only the depositions of Ms. Alvey and one other individual who both stated that they did not recall whether Ms. Alvey had asked for a bed during intake. *Id.* at 3. PSH does not cite any information establishing that Ms. Alvey did *not* ask for a bed during intake. Moreover, PSH cites nothing contradicting Ms. Alvey's testimony that she later saw bunk beds that appeared to be open and asked PSH staff if she could use one of them. *See id.*; *see also* Def.'s MSJ at 16; *see also* Def.'s MSJ, Ex. 1 (ECF 51-1), at 88-89.

accommodation," including a "duty to gather sufficient information from the disabled individual . . . to determine what accommodations are necessary") (alteration omitted).

The specificity of Ms. Alvey's request is in marked contrast to the cases on which PSH relies. In *Wood v. President & Trustees of Spring Hill College*, a student with schizophrenia struggled at a college and then withdrew after one week. 978 F.2d 1214, 1217, 1222 (11th Cir. 1992). And in *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999), a Title I case, a gift shop cashier told her employer that she could not meet new physical job requirements, but resigned without explanation three weeks later rather than asking for an accommodation or even saying that she wanted to continue working. *Compare Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694 (7th Cir. 1998) ("A request as straightforward as asking for continued employment is a sufficient request for accommodation."). Ms. Alvey, by contrast, specifically told PSH staff about the modification she wanted, and thereby fulfilled any obligation she had.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court consider this Statement of Interest in this litigation.

Respectfully submitted this 8th day of September, 2016.

13

VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division

EVE L. HILL
Deputy Assistant Attorney General
Civil Rights Division

REBECCA B. BOND
Chief
ANNE RAISH
Principal Deputy Chief
KATHLEEN P. WOLFE
Special Litigation Counsel
Disability Rights Section
Civil Rights Division


/s/ Elisabeth M. Oppenheimer
ELISABETH M. OPPENHEIMER
Bar No. Massachusetts 686312
Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. – NYA
Washington, D.C.  20530
Telephone:  (202) 616-3653
Facsimile:  (202) 305-9775
elisabeth.oppenheimer@usdoj.gov

14

**CERTIFICATE OF SERVICE**

I hereby certify that Statement of Interest, filed through the CM/ECF system on this 8th day of September 2016, will be sent electronically to the registered participates as identified on the Notice of Electronic Filing (NEF).  I am not aware of any non-registered participants, so electronic filing is the sole means of service of this document.


/s/ Elisabeth Oppenheimer
Elisabeth Oppenheimer