UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AMBER ALVEY,

       Plaintiff,

v.                      Case No. 8:15-cv-1861-T-33AEP

BOB GUALTIERI, in his
official capacity as
Sheriff of Pinellas
County,

       Defendant.
_____/

## ORDER

This matter comes before the Court pursuant to Plaintiff Amber Alvey's Motion for Partial Summary Judgment (Doc. # 49), and Defendant Bob Gualtieri's Motion for Summary Judgment (Doc. # 50), both filed on July 22, 2016. Alvey and Gualtieri filed responses in opposition on August 25, 2016. (Doc. ## 64, 65). On September 8, 2016, both parties filed replies. (Doc. ## 73, 74). Additionally, the United States of America filed a Statement of Interest on September 8, 2016. (Doc. # 75). After due consideration, the Court denies both motions for summary judgment for the reasons that follow.

## I.   Background

Amber Alvey is a sixty year old woman whose physical disabilities cause her to walk with a cane and significantly

1

limit daily life activities like walking, sleeping, and working. (Alvey Dec. Doc. # 49-2 at ¶¶ 2, 4). Alvey also suffers from epilepsy. (Id. at ¶ 2).

On the night of June 19, 2014, because of a lice infestation and illegal activity by other boarders, Alvey left the house in which she rented a room and sought shelter at Pinellas Safe Harbor (Safe Harbor), a shelter serving homeless individuals in Pinellas County. (Id. at ¶¶ 6-8; Alvey Dep. Doc. # 51-1 at 49:7-10, 107:18-108:1). Defendant Gualtieri, as Sherriff of Pinellas County, operates Safe Harbor as a jail diversion program for chronically homeless adults who are at risk of being involved in the criminal justice system. (Gualtieri Dep. Doc. # 49-4 at 28:5-22). Still, Safe Harbor acts as a temporary emergency shelter for homeless individuals, even if they are not involved in the criminal justice system. (Gualtieri Interrog. Response 18, Doc. # 49-14 at 30). Individuals staying at Safe Harbor are called "residents." (Gualtieri Dep. Doc. # 49-4 at 44:2-5).

Safe Harbor is located adjacent to the Pinellas County Jail compound and some inmate workers from the jail help staff Safe Harbor, along with Criminal Justice Specialists (CJS) employed by the Pinellas County Sheriff's Office and privately contracted guards from G4S Services. (Anthony Dep.

2

Doc. # 49-5 at 66:3-21; Haisch Dec. Doc. # 52-4 at ¶¶ 5, 6). Sergeant Zachary Haisch with the Sheriff's Office is in charge of Safe Harbor's day-to-day operations. (Haisch Dep. Doc. # 49-6 at 14:1-15).

Safe Harbor provides various benefits and services to its residents, including, among other things: sleeping arrangements, three meals a day, help applying for social security or Medicare benefits, and assistance finding jobs and housing. (Doc. # 49-12 at 13; Haisch Dec. Doc. # 52-4 at ¶ 38; Haisch Dep. Doc. # 49-6 at 50:5-11). Gualtieri stated that Safe Harbor seeks "to help [its residents] break that cycle of homelessness so they can become productive members of the community and be self-sustaining." (Gaultieri Dep. Doc. # 49-4 at 45:12-14).

Safe Harbor is comprised of sleeping areas called "pods," four of which are indoors. (Haisch Dec. Doc. # 52-4 at ¶¶ 20-24). Only one indoor pod, Pod 3, houses female residents. Pod 6 is an outdoor pod in a covered area that houses both men and women. (Haisch Dec. Doc. # 52-4 at ¶ 25).

In order to stay at Safe Harbor, a resident must be at least eighteen years old. (Semone Dep. Doc. # 49-7 at 13:22-14:1). Residents must be able to care for themselves without the staff's assistance in daily functions. (Haisch Dep. Doc.

# 49-6 at 46:4-6, 46:14-17, 163:5-20; Doc. # 49-12 at 29). Specifically, Safe Harbor's limited staff prevents it from caring for "individuals who are unable to eat, sit down, walk or use the facilities without the assistance of another person." (Doc. # 49-12 at 29).

Safe Harbor does not maintain written policies regarding reasonable accommodations for residents with disabilities. (Haisch Dep. Doc. # 49-6 at 172:6-18, 187:9-12, 192:19-193:3). However, Safe Harbor staff may make a reasonable accommodation if a resident requests one. (Id. at 130:4-19, 192:4-19, 193:1-7). If the CJS staff determine that a resident's physical abilities and medical needs are not conducive to the facility, they have the authority to ban a resident from Safe Harbor. (Id. at 154:16-155:10, 166:22-167:3). Safe Harbor does not provide training on when a resident should be banned for medical reasons, but Sergeant Haisch advises staff to "exercise good judgment and use common sense" in making such decisions. (Id. at 169:17-170:7).

Also, Sergeant Haisch has the authority to overturn bans or other decisions regarding residents' access to Safe Harbor's services. (Gualtieri Dep. Doc. # 49-4 at 73:24-74:8; Haisch Dep. Doc. # 49-6 at 97:11-98:1). Haisch regularly reviews the end-of-shift logs entered by CJS staff and the

daily reports prepared by G4S guards. (Haisch Dep. Doc. # 49-6 at 97:4-10; 122:21-25).

There are three bedding options to which residents are assigned at intake: bunk beds, floor mats, and "boats." (Gualtieri Dep. Doc. # 49-4 at 60:22-61:5). The bunk beds are "barracks-style" metal bed frames bolted to the floor. (Haisch Dep. Doc. # 49-6 at 90:10-16, 228:4-11). A bottom bunk is raised 17 inches off the floor. (Doc. # 49-22 at ¶ 8). "Boats" are platforms on which the floor mats are placed; the "boat" elevates the mat to a height of 10 to 11 inches. (Id.). An ADA checklist published by the Department of Justice (DOJ) suggests that cots in emergency shelters be at least 17 inches off the floor to be accessible. (Doc. # 49-37 at 30).

Beds are assigned on a first come, first served basis, without beds specifically reserved for residents with disabilities. (Cline Dep. Doc. # 49-9 at 16:1-16). Nevertheless, preference for bottom bunks is given to veterans and residents with disabilities affecting their mobility. (Haisch Dep. Doc. # 49-6 at 82:18-83:15; Novak Dep. Doc. # 51-14 at 24:23-25:4). Also, Safe Harbor staff often assigns bottom bunks as an incentive to residents who are complying with Safe Harbor's program by looking for work. (Novak Dep. Doc. # 51-14 at 25:10-18). "Boats" are typically

assigned to residents only if a doctor's note states that the
resident requires the higher sleeping height. (Haisch Dec.
Doc. # 52-4 at ¶ 23; Semone Dep. Doc. # 49-7 at 82:7-19,
83:10-22). In Pod 3, the indoor pod to which Alvey was
assigned, there are a total of 85 sleeping spaces: 56 metal
bunk beds, and room on the floor for 29 mats and boats.
(Haisch Dep. Doc. # 49-6 at 85:25-86:4). Of the 56 beds, 28
are bottom bunks. (Id. at 85:25-86:4).

At intake, Alvey answered CJS Katherine Semone and CJS
James Novak's questions about her history, employment and
income, and housing status. (Gualtieri Interrog. Response 2,
Doc. # 49-14 at 20; Alvey Dep. Doc. # 51-1 at 63:8-11; Novak
Dep. Doc. # 51-14 at 41:2-6). Safe Harbor seeks this
information from its residents at intake and enters it into
the Tampa Bay Information Network (TBIN) system, which is
used by various shelters across the Tampa Bay area. (Haisch
Dep. Doc. # 49-6 at 50:9-20; Semone Dep. Doc. # 49-7 at 12:6-
21). In June of 2014, one of the questions on the system's
standard intake form was "Do you have a disability of long
duration?" (Haisch Dep. Doc. # 49-6 at 62:5-17). Alvey's TBIN
intake form indicates that she has "a disability of long
duration." (Doc. # 49-12 at 7).

During intake, Alvey, who had been walking with a cane, sat in an empty wheelchair belonging to Safe Harbor. Alvey "claimed that she could not sit/lay down on a mat without assistance." (Gualtieri Interrog. Response, 2 Doc. # 49-14 at 20). After her intake interview, Alvey was wheeled to Pod 3 by a staff member. (Alvey Dec. Doc. # 49-2 at ¶ 8; Alvey Dep. Doc. # 51-1 at 65:15-66:13, 66:15-16).

Alvey requested a raised bed because of her difficulty sitting or lying down. (Gualtieri Interrog. Responses 2-3, Doc. # 49-14 at 20). Safe Harbor did not provide her with a bottom bunk; rather, Alvey was assigned a "boat" for the floor, even though Alvey did not present a doctor's note. (Gualtieri Interrog. Response 3, Doc. # 49-14 at 20; Alvey Dep. Doc. # 51-1 at 75:15-25).

Yet, the TBIN system used by Safe Harbor to track information about its residents indicates that there may have been some bunk beds available that night. (Doc. # 49-36). However, as Gualtieri notes, there are discrepancies in the bed records. (Doc. # 65 at 15 n.7). Alvey states that there were open bunk beds in Pod 3 during her stay. (Alvey Dep. Doc. # 51-1 at 88:8-15). Alvey further alleges that she asked Safe Harbor staff members if she could move to an empty bed, but her request was denied. (Alvey Dec. Doc. # 49-2 at ¶ 10;

7

Alvey Dep. Doc. # 51-1 at 88:16-89:17). Staff informed Alvey that the empty beds were not assigned to anyone but were being kept open in case someone more severely disabled arrived. (Alvey Dep. Doc. # 51-1 at 88:16- 89:17).

Additionally, Safe Harbor has a policy of locking all narcotic medications in a medical room or "pharmacy." (Haisch Dep. Doc. # 49-6 at 128:24-129:3). Narcotic medications are locked away for the safety of the residents and because inmates from the neighboring jail work in the facility. (Id. at 127:24-128:9). Staff members are able to access the locked room only if they are accompanied by another staff member. (Id. at 130:20-131:4). Staff members provide residents with their stored medications twice daily, unless residents request access to their narcotic medications at other times. (Id. at 130:4-7; Haisch Dec. # 52-4 at ¶ 29).

Alvey has prescriptions for both narcotic and non-narcotic drugs, which Alvey tracks on a list stating the times to take each medication. (Alvey Dep. Doc. # 51-1 at 63:22-24, 64:9-12). Because Alvey kept all of her medications in one bottle, Safe Harbor required Alvey to turn over that bottle during intake. (Alvey Dec. Doc. # 49-2 at ¶ 9; Alvey Dep. Doc. # 51-1 at 67:16-68:24, 69:16-70:2).

Throughout her twenty hour stay in Pod 3 on June 20, 2014, Alvey laid down on her "boat," ate one or two meals, and used the bathroom at least once. (Alvey Dep. Doc. # 51-1 at 72:5-8, 72:15-73:11, 77:10-11). Staff signed a medication log, indicating that they provided medication to Alvey. (Doc. # 49 at ¶ 25; Semone Dep. Doc. # 49-7 at 45:1-24).

During a head-count of the shelter's residents around 8:00 p.m. that night, Alvey fell and injured her hip, elbow, and head, as she tried to get up from her "boat" with her cane. (Alvey Dec. Doc. # 49-2 at ¶ 11). Because she had hit her head and was suffering back and hip pain, Alvey was taken by ambulance to Northside Hospital where she was treated with pain medication. (Alvey Dep. Doc. # 51-1, 92:14-17; Doc. # 52-5).

Meanwhile, Alvey was checked out of Safe Harbor at 9:43 p.m. on June 20, 2014, through the TBIN system. (Doc. # 49-14 at 13). Additionally, a Safe Harbor staff member determined that Safe Harbor was "not conducive to the medical needs of [Alvey]" and banned her from Safe Harbor. (Doc. # 51-25 at 68).

After being released from the hospital, Alvey attempted to return to Safe Harbor after midnight on June 21, 2014, because she had nowhere else to stay. (Doc. # 13 at ¶ 35;

Doc. # 49 at ¶¶ 40-41). Alvey asserts that she was told by a guard at the gate that she could not re-enter Safe Harbor because she was not medically fit and had been banned. (Alvey Dep. Doc. # 51-1 at 105:20-106:19). According to Alvey, the guard told her that she would have to come back another day to retrieve her medicine. (Id. at 114:22-115:6).

That night, Alvey slept on a bus bench near Safe Harbor as she could not walk far and had nowhere else to go. (Alvey Dec. Doc. # 49-2 at ¶ 15). Alvey returned to Safe Harbor two days later, on June 23, 2014, and retrieved her medications without being allowed inside the facility. (Id. at ¶ 16).

On August 10, 2015, Alvey filed her Complaint against Gualtieri in his official capacity as Sheriff of Pinellas County, alleging that Safe Harbor intentionally discriminated against her in violation of Title II of the Americans with Disabilities Act (ADA) by failing to provide her with reasonable modifications that would have allowed Alvey to participate in Safe Harbor's services and programs. (Doc. # 1 at ¶¶ 56-64). Alvey sought both injunctive relief and damages for the intentional discrimination and injury she allegedly suffered at Safe Harbor. (Id. at 12). The case proceeded and, by Court order, the parties mediated; however, mediation was unsuccessful. (Doc. ## 26, 27, 37).

Subsequently, Alvey filed her Motion for Partial Summary Judgment and Gualtieri filed his Motion for Summary Judgment. (Doc. ## 49, 50). The parties both filed responses in opposition and replies. (Doc. ## 64, 65, 73, 74).

During the briefing period for the cross-motions for summary judgment, Gualtieri filed a motion to dismiss Alvey's claim for injunctive relief for lack of standing. (Doc. # 63). On October 18, 2016, the motion to dismiss was granted. (Doc. # 86). Accordingly, only Alvey's claims for past acts of discrimination remain for the Court's decision on the cross-motions for summary judgment.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742

11

(11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a

genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984)("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . .")(quotation omitted).

III. **Analysis**

Title II of the ADA prohibits discrimination in public services and transportation and states, "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

The Department of Justice (DOJ) promulgates regulations implementing the ADA. For Title II of the ADA, the regulations state that a public entity may not:

> (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;
> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
> (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others

28 C.F.R. § 35.130(b)(1)(i)-(iii). However, a public entity also may not

> [p]rovide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities

14

> with aids, benefits, or services that are as
> effective as those provided to others.

28 C.F.R. § 35.130(b)(1)(iv). As the DOJ is charged with promulgating regulations to implement the ADA, the DOJ's regulations are entitled to substantial deference. Blum v. Bacon, 457 U.S. 132, 141 (1982)(stating "the interpretation of an agency charged with the administration of a statute is entitled to substantial deference"); see also Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 598 (1999)(noting that DOJ's interpretation of Title II of the ADA "warrant[s] respect").

In order to state a claim under Title II of the ADA, a plaintiff must allege:

> (1) that he is a qualified individual with a
> disability; (2) that he was excluded from
> participation in or . . . denied the benefits of
> the services, programs, or activities of a public
> entity or otherwise discriminated against by such
> entity; (3) by reason of such disability.

Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001)(internal citations omitted). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modification . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation

in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

Here, there is no dispute that Alvey is disabled. (Doc. # 50 at 15). Rather, the question is whether Gualtieri excluded Alvey from, or denied her the benefits of, Safe Harbor's services or programs, on the basis of her disability, by failing to provide Alvey with a bottom bunk, banning her from Safe Harbor as "medically unfit," and refusing to return Alvey's medications on the night of her departure.

### A. Reasonable Modification During Alvey's Stay

A plaintiff can proceed on theories of intentional discrimination, disparate treatment, or failure to make reasonable accommodations. Schwarz v. City of Treasure Island, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008). In cases alleging a failure to make reasonable accommodations, the defendant's duty to provide a reasonable accommodation is not triggered until the plaintiff makes a specific demand for an accommodation or the need for an accommodation becomes obvious. See Wolfe v. Fla. Dep't of Corr., No. 5:10-CV-663-OC-PRL, 2012 WL 4052334, at *4 (M.D. Fla. Sept. 14, 2012)("In addition to showing that Wolfe is a qualified individual with a disability, Plaintiff must show that Wolfe requested an accommodation or the need for one was obvious and the public

entity failed to provide a reasonable accommodation.")(citing McCoy v. Tex. Dep't of Criminal Justice, No. C-05-370, 2006 WL 2331055, *7-9 (S.D. Tex. Aug. 9, 2006)); see also Rylee v. Chapman, 316 Fed. Appx. 901, 906 (11th Cir. 2009)("In cases alleging a failure to make reasonable accommodations, the defendant's duty to provide a reasonable accommodation is not triggered until the plaintiff makes a 'specific demand' for an accommodation.").

When the public entity provides a reasonable accommodation that gives a disabled individual an "equal opportunity to . . . gain the same benefit," the public entity has provided "meaningful access." Alexander v. Choate, 469 U.S. 287, 301 (1985). "The reasonableness of an accommodation is generally a question of fact not appropriate for resolution on summary judgment." Wolfe, 2012 WL 4052334, at *4.

Furthermore, a governmental entity does not have to institute an accommodation that would "fundamentally alter" its programs or services. 28 C.F.R. § 35.130(b)(7)(i)("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the

17

service, program, or activity."). The burden of proving a fundamental alteration lies with the defendant; "[i]f the defendant fails to meet this burden, it must make the requested modification." <u>Alumni Cruises, LLC v. Carnival Corp.</u>, 987 F. Supp. 2d 1290, 1306 (S.D. Fla. 2013).

### 1. **Alvey's Motion**

As a preliminary matter, the Court notes that Gualtieri failed to specifically admit or deny each allegation in Alvey's statement of material facts in his response to Alvey's Motion. (Doc. # 65). Accordingly, in evaluating Alvey's Motion, Alvey's statement of material facts is deemed admitted. <u>See</u> (Doc. # 33 at 7)("The memorandum in opposition shall specify the material facts as to which the opposing party contends there exists a genuine issue for trial, and shall be accompanied by affidavit(s) and other evidence in the form required by Fed. R. Civ. P. 56."); <u>see also</u> United States District Court, Middle District of Florida, Judicial Info, Virginia M. Hernandez Covington, Civil Motions, Motions for Summary Judgment, Statement of Material Facts, http://www.flmd.uscourts.gov/judicialInfo/Tampa/JgCovington.htm (October 28, 2016, at 3:27 PM)("In deciding a motion for summary judgment, the Court will deem admitted any fact in the statement of material facts that the opposing party does

not specifically controvert, provided the moving party's statement is supported by evidence in the record.").

The statement of material facts in Gualtieri's Motion does not constitute a refutation of Alvey's statement of material facts. See Rives v. Lahood, 605 Fed. Appx. 815, 817-18 (11th Cir. 2015)(finding that "[t]he magistrate judge did not abuse her discretion in deeming [defendant's] statement of undisputed material facts admitted because [plaintiff] did not respond to the statement as required by [the local rules]," even though plaintiff disputed those facts in his own motion for summary judgment).

Nevertheless, Gualtieri's failure to dispute Alvey's statement of material facts does not permit a finding on behalf of Alvey unless her assertions are supported by evidence in the record. See Id. at 818 ("[A]fter deeming the movant's statement of undisputed facts to be admitted . . . the district court must then review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact.")(quoting Reese v. Herbert, 527 F.3d 1253, 1269 (11th Cir. 2008)(internal quotation marks omitted)).

As Gualtieri admitted the facts of Alvey's Motion, Gualtieri has not asserted that the modifications in dispute would have fundamentally altered Safe Harbor's services and

programs. Therefore, the only question is whether the undisputed facts establish that Safe Harbor failed to reasonably accommodate Alvey by assigning her to a "boat" rather than a bottom bunk.

Alvey asserts that Safe Harbor failed to reasonably accommodate her when it denied her request to be assigned to a bed, rather than a "boat." (Doc. # 49 at 20). She requested a bed at intake because she has difficulty sitting down and getting up from the ground, but she was told that none were available. (Gualtieri Interrog. Responses 2-3, Doc. # 49-14 at 20). One of Gualtieri's verified responses to Alvey's interrogatories states:

> On intake on June 20, 2014, [Alvey] requested a bed at [Safe Harbor]. No beds were available in the female dorm (Pod # 3), so PCSO employees CJS Novak and CJS Semone had the authority to grant [Alvey] the reasonable modification of providing her a boat inside Pod # 3 without a doctor's note.

(Id.).

Although Alvey did not recall requesting a bed at intake specifically, she recalled that she had entered Safe Harbor walking with a cane and had moved to an empty wheelchair she found there. (Alvey Dec. Doc. # 49-2 at ¶ 8; Alvey Dep. Doc. # 51-1 at 124:24-125:1). Thus, during intake, Alvey sat in a wheelchair and answered that she suffers from a disability of

long duration — the situation CJS Novak testified would result in him assigning a resident to a lower bunk if available, or otherwise providing the resident with a "boat" even if he or she did not have a doctor's note. (Novak Dep. Doc. # 51-14 at 33:14-34:20). Even if Alvey did not request a bed at intake, a reasonable jury could find that her disability was obvious to Safe Harbor staff at that point.

A genuine factual dispute surrounds whether beds were available in Pod 3 when Alvey stayed at Safe Harbor. The most significant evidence regarding the availability of beds in Pod 3 is the TBIN bed records from June 19-21, 2014. (Doc. # 49-36). The records include a chart with the number of each sleeping space listed, and the identifying number of the resident assigned to each space. For the nights of June 20 and 21, 2014, the nights in which Alvey stayed at Safe Harbor or sought to return there after the hospital, the records show blank spaces by a number of bunk bed spots. (Id.). The blank spaces, where a resident's identity number would be placed, indicate that those beds were not assigned to anyone at that time. (Id.).

Alvey asserts that the bed records prove that Safe Harbor staff assigned Alvey to a "boat," even though there were beds available — beds staff members testified were typically given

to disabled residents like Alvey when available. <u>See</u> (Novak
Dep. Doc. # 51-14 at 24:23-25:4). As Gualtieri did not
controvert Alvey's statement of material facts, Gualtieri
admits the authenticity of the bed records. However, as
Gualtieri notes, there are discrepancies in the records.
(Doc. # 49-36; Doc. # 65 at 15 n.7). Specifically, for the
three days of the record, June 19-21, 2014, two bottom bunks,
sleeping spaces 20 and 78, are marked with three different
resident numbers each, implying that each of those bunks was
assigned to three Pod 3 residents at the same time. <u>See</u> (Doc.
# 49-36).

Such inconsistent records do not establish that bottom
bunks were available while Alvey stayed on her "boat" in Pod
3 because reasonable minds could draw different inferences
from the bed records. <u>See</u> <u>United States v. Oakley</u>, 744 F.2d
1553, 1555 (11th Cir. 1984)("[I]f reasonable minds differ on
the inferences arising from undisputed facts, summary
judgment should be denied.")(citing <u>Warrior Tombigbee Transp.</u>
<u>Co. v. M/V Nan Fung</u>, 695 F.2d 1294 (11th Cir. 1983)). Indeed,
if the additional residents listed under the bottom bunks 20
and 78 had been assigned to the other bottom bunks that appear
empty on the record, then no bottom bunks would have been
available for Alvey. Thus, those records do not establish

that there were bottom bunks available in Pod 3 on the nights of June 20, 2014, when Alvey stayed at Safe Harbor, and June 21, 2014, when Alvey returned from the hospital and was denied a space in Pod 3.

If a factfinder infers from the bed records that bottom bunks were not available, then the bed records conflict with Alvey's deposition testimony that she saw empty and unassigned beds, which she was not allowed to use. As "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," summary judgment for Alvey would be inappropriate. Strickland v. Norfolk S. Ry. Co., 692 F.3d 1151, 1154 (11th Cir. 2012)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). A reasonable jury could infer from the ambiguous bed records and Gualtieri's verified interrogatory response that "[n]o beds were available in [Pod 3]" on June 20, 2014, that there were no empty beds in Pod 3 during Alvey's stay and, thus, Alvey did not request to move to an empty bed. (Gualtieri Interrog. Response 3, Doc. # 49-14 at 20; Doc. # 49-36).

A jury should weigh the testimony and evidence from both sides on this issue and determine whether beds were available

in Pod 3 during Alvey's stay at Safe Harbor and after her return from the hospital.

Furthermore, if there were no beds available when Alvey arrived at Safe Harbor on June 20, 2016, then there is a genuine issue of material fact whether providing Alvey with a "boat" without a doctor's note was a reasonable accommodation. Although the DOJ's ADA checklist for emergency shelters emphasizes that beds the height of Safe Harbor's bottom bunks are necessary for disabled individuals, Safe Harbor's failure to provide a bed conforming to the checklist's suggestion is not necessarily a failure to reasonably accommodate Alvey. See (Doc. # 49-37 at 30)(stating that accessible cots in emergency shelters should be at least 17 inches from the floor).

Alvey arrived at Safe Harbor past midnight on June 20, 2014; however, Safe Harbor's curfew for residents is 8 p.m. (Haisch Dep. Doc. # 49-6 at 108:15-23). Thus, if all beds were full, Safe Harbor staff would have had to oust another resident from their assigned bed in the early morning hours to give Alvey a bottom bunk when she first arrived.

Staff could have reassigned a resident in a bottom bunk for Alvey later during the day of June 20, 2014. However, it is unclear whether reassigning a resident in a bottom bunk so

24

that Alvey could move from her "boat" would be a reasonable accommodation at any time. Other disabled residents and veterans are often given priority to take those bottom bunks. (Haisch Dep. Doc. # 49-6 at 82:18-83:15; Novak Dep. Doc. # 51-14 at 24:20-25:4). Furthermore, Safe Harbor staff often assigns bottom bunks as an incentive to residents who are complying with Safe Harbor's program by looking for work. (Novak Dep. Doc. # 51-14 at 25:10-18). As bottom bunks are often given to such residents, a genuine issue of material fact exists whether it would be reasonable to move another resident from their bed for Alvey either when Alvey arrived in the early morning hours or during the day on June 20, 2014.

Therefore, summary judgment is precluded on Alvey's claim that Gualtieri failed to reasonably accommodate Alvey by not assigning her to a bottom bunk.

### 2. Gualtieri's Motion

Gualtieri argues in his Motion that Alvey had "meaningful access" to Safe Harbor's programs and services during her time there. (Doc. # 50 at 17). According to Gualtieri, Safe Harbor did not fail to reasonably accommodate Alvey because "when an individual already has 'meaningful access' to a benefit to which he or she is entitled, no additional accommodations, 'reasonable' or not, need to be

provided by [the governmental entity]." <u>Medina v. City of Cape Coral, Fla.</u>, 72 F. Supp. 3d 1274, 1278 (M.D. Fla. 2014)(citation omitted).

Gualtieri asserts that reasonable accommodations were made for Alvey at Safe Harbor. Specifically, Alvey was assigned to a "boat" rather than a mat on the floor without presenting a doctor's note. (Alvey Dep. Doc. # 51-1 at 75:15-25). Gualtieri emphasizes that it is Safe Harbor's policy not to assign a resident to a "boat," unless the resident presents a doctor's note. (Haisch Dec. Doc. # 52-4 at ¶ 23; Semone Dep. Doc. # 49-7 at 82:7-19, 83:10-22).

Gualtieri is correct that Alvey was entitled to a reasonable accommodation, but not necessarily the accommodation of her choice. <u>See</u> <u>Stewart v. Happy Herman's Cheshire Bridge, Inc.</u>, 117 F.3d 1278, 1285-86 (11th Cir. 1997)("Stated plainly, under the ADA a qualified individual with a disability is 'not entitled to the accommodation of her choice, but only to a reasonable accommodation.'"); <u>Redding v. Nova Se. Univ., Inc.</u>, 165 F. Supp. 3d 1274, 1296-97 (S.D. Fla. 2016)(stating in the ADA Title III context that a student "was entitled to only a reasonable accommodation and not necessarily the accommodation of her choice"); <u>but see</u> <u>Alboniga v. Sch. Bd. of Broward Cty. Fla.</u>, 87 F. Supp. 3d

1319, 1341 (S.D. Fla. 2015)(noting in ADA Title II case that "refusing Plaintiff's requested accommodation if it is reasonable in favor of one the [Defendant] prefers is akin to allowing a public entity to dictate the type of services a disabled person needs in contravention of that person's own decisions regarding his own life and care").

However, as the DOJ's regulations specify, Gualtieri was required to provide Alvey with a reasonable accommodation that would be as effective in affording Alvey a safe sleeping arrangement as provided to other residents. See 28 C.F.R. § 35.130(b)(1)(iii). Thus, Safe Harbor's providing Alvey a "boat" does not establish that Alvey enjoyed the same benefits of Safe Harbor's shelter as residents without disabilities if she was at greater risk of injuring herself when she used the "boat." Cf. Allah v. Goord, 405 F. Supp. 2d 265, 280 (S.D.N.Y. 2005)("Although [the wheelchair-bound inmate] is not wholly precluded from participating in [the service of medical care in facilities outside the prison], if he is at risk of incurring serious injuries [in the inadequate van] each time he attempts to take advantage of outside medical attention, surely he is being denied the *benefits* of this service.")(emphasis in original). While a mat or "boat" on the floor provides the service of a safe sleeping arrangement

for residents without disabilities, providing Alvey with a "boat" may not provide her with the same benefits of that sleeping arrangement because Alvey was at greater risk of injury while using the "boat." As Alvey was injured while attempting to stand up from her "boat," a reasonable jury could conclude that the "boat" did not provide Alvey with the benefits of a safe sleeping arrangement enjoyed by other residents.

As the Eleventh Circuit has explained, "[w]hat is reasonable must be decided case-by-case based on numerous factors." Bircoll v. Miami-Dade Cty., 480 F.3d 1072, 1086 (11th Cir. 2007). Here, one factor that a factfinder may consider relevant is the availability of Alvey's requested accommodation. See Cmty.'s Actively Living Independently & Free v. City of Los Angeles, No. CV 09-0287 CBM (RZx), 2011 WL 4595993, at *16 (C.D. Cal. Feb. 10, 2011)(granting summary judgment to plaintiff on liability and noting that "reasonable modification(s) to the [defendant's] emergency preparedness program are available" and the defendant "presented no evidence demonstrating that any specific reasonable modification would fundamentally alter the nature of its emergency preparedness program or cause undue burden"); see also Clemons v. Dart, 168 F. Supp. 3d 1060,

1071-72 (N.D. Ill. 2016)(granting summary judgment for double-amputee inmate on ADA claim where, despite the availability of "some ADA compliant cells, . . . for whatever reason, [the inmate] was not placed in any of those cells").

Taken in the light most favorable to Alvey, the discrepancy in the bed records could indicate that the blank bed spaces were available and the additional residents listed under certain bunks were merely left on the list as a clerical error. If a reasonable factfinder made this inference, the blank spaces on the records support Alvey's deposition testimony that beds were available when Safe Harbor staff denied Alvey's request and controvert Gualtieri's statement that "[n]o beds were available" in Pod 3 when Alvey arrived at Safe Harbor. (Gualtieri Interrog. Response 3, Doc. # 49-14 at 20).

A reasonable jury could find that a refusal to give Alvey a bottom bunk when some were empty renders Alvey's assignment to a "boat" an insufficient accommodation that failed to provide Alvey the benefits of Safe Harbor's services and programs enjoyed by residents without disabilities.

Even if beds were available, Gualtieri asserts that Alvey did not make a specific demand for an accommodation. (Doc. # 50 at 15). Alvey controverts this assertion. (Doc. #

64 at 14). Gualtieri conceded in his response to Alvey's interrogatories that Alvey requested a bed at intake but no beds were available. (Gualtieri Interrog. Response 3, Doc. # 49-14 at 20). In her deposition, Alvey stated that she requested an empty bottom bunk in Pod 3 but was told by Safe Harbor staff that those beds were being kept empty in case a more severely disabled resident arrived. (Alvey Dep. Doc. # 51-1 at 88:16-89:17).

Although the Eleventh Circuit has not ruled on the specificity required of a request for accommodation under Title II of the ADA, that court has held in Fair Housing Act and ADA Title I cases that no particular form is required. Rather, the focus is whether the defendant "[has] enough information to know of both the disability and desire for an accommodation, or circumstances must at least be sufficient to cause a reasonable [defendant] to make appropriate inquiries about the possible need for accommodation." United States v. Hialeah Hous. Auth., 418 Fed. Appx. 872, 876 (11th Cir. 2011)(quoting Colwell v. Rite Aid Corp., 602 F.3d 495, 506 (3d Cir. 2010)); see also Holly v. Clarison Indus., LLC, 492 F.3d 1247, 1261 n.14 (11th Cir. 2007)(noting in ADA Title I case that the Eleventh Circuit has not "determined precisely what form the request must take").

30

Taken in the light most favorable to Alvey, Alvey's request for an empty bottom bunk from a Safe Harbor staff member gave the staff notice of her desire for a bed. Also, staff knew of Alvey's disability because she walked with a cane and Alvey's TBIN records reflect that she had a disability of long duration. Her disability was obvious to the extent that staff decided to give Alvey a "boat" without a doctor's note.

Taking the evidence in the light most favorable to Alvey, genuine issues of material fact exist regarding whether bottom bunks were available in Pod 3 and whether Alvey requested a bed as a reasonable accommodation. Furthermore, a reasonable factfinder could find that the provision of a "boat," rather than a bottom bunk, did not allow Alvey to enjoy the same benefits of Safe Harbor's shelter services and was not a reasonable accommodation regardless of bed availability. These genuine issues of material fact preclude summary judgment regarding Alvey's claims that Gualtieri failed to reasonably accommodate her by assigning her to a "boat," instead of a bottom bunk.

## B. <u>Reasonable Accommodation After Alvey's Stay</u>

### 1. <u>Alvey's Motion</u>

Alvey alleges that Gualtieri failed to reasonably accommodate her when staff banned her from Safe Harbor. (Doc. # 49 at 16-17). Alvey also states that Safe Harbor failed to reasonably accommodate her when a guard at Safe Harbor's gate refused to return her medications from the shelter's pharmacy the night she was banned. (<u>Id.</u>).

According to the TBIN records, Alvey was checked out of Safe Harbor at 9:43 p.m. on the night of June 20, 2014. (Doc. # 49-14 at 13). At that time, the staff entered the ban because the facility was not "conducive to the medical needs of [Alvey]." (Doc. # 51-25 at 68). Alvey stresses, and Gualtieri does not contest, that the permanent ban remains in place to this day. (Doc. # 49 at ¶ 46; Doc. # 49-12 at 10; Cline Dep. Doc. # 49-9 at 80:2-7).

Safe Harbor's residents must be able to care for themselves because Safe Harbor's limited staff prevents it from caring for "individuals who are unable to eat, sit down, walk or use the facilities without the assistance of another person." (Doc. # 49-12 at 29). Under 28 C.F.R. § 35.130(b)(8),

> [a] public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any

32

> class of individuals with disabilities from fully
> and equally enjoying any service, program, or
> activity, unless such criteria can be shown to be
> necessary for the provision of the service,
> program, or activity being offered.

Id. Additionally, a public entity is not required to provide "services of a personal nature including assistance in eating, toileting or dressing" that are not already part of its services. 28 C.F.R. § 35.135.

Safe Harbor's policy that residents be able to care for themselves in daily functions has the tendency to screen out individuals with disabilities. Cf. Rendon v. Valleycrest Prod., Ltd., 294 F.3d 1297, 1285-86 (11th Cir. 2002)(finding discriminatory screening methods violate the ADA). Still, a genuine issue of material fact exists whether the criteria is necessary for Safe Harbor to provide its services.

Alvey told Safe Harbor staff that "she could not sit/lay down on a mat without assistance." (Gualtieri Interrog. Response, 2 Doc. # 49-14 at 20). Additionally, Alvey can only walk short distances. (Alvey Dep. Doc. # 51-1 at 31:22-32:1). For that reason, Alvey was taken in a wheelchair by a staff member to Pod 3 after her intake interview. (Id. at 89:18-90:9). Furthermore, Alvey was injured while standing up from her "boat" to attend Safe Harbor's nightly head-count outside. (Alvey Dec. Doc. # 49-2 at ¶ 11).

If Alvey could not be assigned to a bed and would require assistance getting up from a "boat" for required headcounts or other activities, as well as needing a wheelchair pushed by a staff member to travel longer distances around the facility, reasonable minds could differ on whether Alvey's needs could be met by Safe Harbor's limited staff. Thus, a reasonable jury could conclude that Alvey's needs, including her difficulty sitting and lying down, standing up from the ground, and walking without assistance, rendered her unqualified to stay at Safe Harbor even if a bottom bunk were available. Although the determination that Alvey was medically unfit to stay at Safe Harbor screened out Alvey from its services, taking the evidence in the light most favorable to Gualtieri, Safe Harbor's criteria regarding residents' physical abilities may be necessary given Safe Harbor's staffing limitations.

Furthermore, as Alvey arrived back at Safe Harbor late in the evening, a reasonable jury could conclude that requiring staff to gather Alvey's belongings and medications from the locked medicine room and immediately return them to her was not a reasonable accommodation. The night shift at Safe Harbor is typically staffed by one CJS, while the morning and afternoon shifts are typically staffed by two. (Haisch

Dec. Doc. # 52-4 at ¶ 9). However, Safe Harbor's medicine policy requires two staff members to access any medication from the locked room for security reasons. (Haisch Dep. Doc. # 49-6 at 130:20-131:4). With its security concerns over the distribution of narcotics among the residents, and the leaner staffing maintained over the night shift, reasonable minds could differ on whether requiring two staff members to immediately procure and return her medications would be a reasonable accommodation.

Therefore, summary judgment cannot be granted on Alvey's claim that Gualtieri discriminated against her by banning her as medically unfit for Safe Harbor and failing to return her medications immediately.

### 2. **Gualtieri's Motion**

Gualtieri argues that Alvey has not established that she was excluded discriminatorily from the services, programs, and benefits of Safe Harbor when she was banned from the shelter as medically unfit and was denied the immediate return of her medications. (Doc. # 50 at 19-20). However, Gualtieri has not provided evidence that Safe Harbor staff considered whether Alvey would be medically fit to stay at Safe Harbor if she was provided her requested reasonable accommodation — a bottom bunk. See PGA Tour, Inc. v. Martin, 532 U.S. 661,

688 (2001)(stating, in the ADA Title III context, that "an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration").

Additionally, Gualtieri asserts that Alvey was not prevented from entering Safe Harbor upon her return from the hospital, and thus was not excluded from its services. Gualtieri concedes that Alvey stated that a guard denied Alvey reentry to Safe Harbor. (Doc. # 50 at ¶ 35; Alvey Dep. Doc. # 51-1 at 105-18-106:19). However, Gualtieri points to an incident report by Safe Harbor staff, stating that Alvey was offered an outdoor sleeping space in Pod 6 because Pod 6 has a staff member or guard present at all times who could assist Alvey if she needed additional help. (Doc. # 51-25 at 69; Haisch Dep. Doc. # 49-6 at 109:12-110:15).

Alvey argues that the Court should not consider the incident report, which states that Alvey was offered a sleeping space in Pod 6 after returning from the hospital, because it is inadmissible hearsay. (Doc. # 64 at ¶ 27). "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." Jones v. UPS

Ground Freight, 683 F.3d 1283, 1293 (11th Cir. 2012)(quoting Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999)). However, if the hearsay statement could be reduced to admissible evidence at trial or reduced to admissible form, a court may consider the statement in deciding a motion for summary judgment. Id. at 1293-94.

Here, the incident report was completed by Community Policing Officer Cook, and the report appears based on his personal interaction with Alvey. (Doc. # 51-25 at 69). If the report is based on Cook's personal knowledge, then Cook could testify at trial regarding his conversation with Alvey. See Jones, 683 F.3d at 1294 ("The most obvious way that hearsay can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial."). However, if Cook was recording what he had been told by the other Safe Harbor staff who are listed on the report as "person(s) involved," then the incident report may not be reducible to admissible form.

Regardless, the incident report would not necessarily establish that Alvey had been offered a reasonable accommodation when she returned from the hospital to Safe Harbor. Residents in Pod 6 can only sleep on mats or "boats," as there are no bunk beds in that pod. (Semone Dep. Doc. #

49-7 at 85:25-86:8). While Pod 6 has a guard or other staff member present at all times, staff assign residents who have violated Safe Harbor's rules, missed curfew, or returned to the shelter severely intoxicated to this outdoor pod. (Haisch Dec. Doc. # 52-4 at ¶ 25).

Thus, if Alvey would be qualified to stay at Safe Harbor with the reasonable accommodation of a bottom bunk in Pod 3, if it were available, there is a genuine issue of material fact whether banning Alvey permanently or alternatively offering her another "boat" in the less desirable Pod 6 constituted a failure to provide a reasonable accommodation.

However, the bed records for the night of June 21, 2014, can be interpreted as supporting either that beds were available or that every bed was full. (Doc. # 49-36). If all beds were full when Alvey returned from the hospital past Safe Harbor's curfew, reasonable minds could disagree over whether Alvey would be qualified to stay at Safe Harbor as Alvey would need to be assigned to a "boat," like the one from which she was unable to lift herself safely, unless staff moved another resident from her assigned bottom bunk for Alvey.

Regarding Alvey's medications, Gualtieri points out that the guards at Safe Harbor's gates are not employees of the

Pinellas County Sheriff's Department. Rather, they are employees of G4S Services, a private security company that contracts with the Pinellas County Sheriff and provides additional security at Safe Harbor. (Haisch Dec. Doc. # 52-4 at ¶ 6). The Eleventh Circuit has held that "a private corporation is not a public entity merely because it contracts with a public entity to provide some service." Edison v. Douberly, 604 F.3d 1307, 1310 (11th Cir. 2010). Therefore, a private corporation, even if fulfilling a traditional government function, is not subject to liability under Title II of the ADA. See Id. ("Since GEO is such a private corporation, we hold that GEO is not a public entity subjecting it to liability under Title II of the ADA . . .").

Gualtieri argues that because Alvey stated she was refused her medications by someone working at Safe Harbor's gate, she must have been refused by a private guard rather than a Safe Harbor employee. Therefore, Gualtieri asserts that Alvey cannot establish that she was denied the reasonable accommodation of her medications by a Safe Harbor employee. (Doc. # 50 at 20).

Taking the evidence in the light most favorable to Alvey, the fact that a private guard may have been the person who told Alvey that she could not re-enter Safe Harbor does not

39

preclude the inference that Safe Harbor staff failed to reasonably accommodate Alvey. Safe Harbor staff entered the ban on Alvey hours before she returned and had access to the locked medicine room, which could lead a reasonable factfinder to infer that Safe Harbor staff had made the decision to turn Alvey away as medically unfit and refuse to return her medications that night. See (Haisch Dep. Doc. # 49-6 at 154:16-155:10, 166:22-167:3). If Safe Harbor staff had been made aware of Alvey's requests to enter the shelter or for her medications to be returned, but instructed the guard to deny these requests, then a reasonable jury may conclude that Safe Harbor staff, rather than a G4S guard, failed to reasonably accommodate Alvey and thereby violated Title II of the ADA.

These genuine issues of material fact preclude summary judgment regarding Alvey's claims that Gualtieri failed to reasonably accommodate her by banning her as medically unfit for Safe Harbor and failing to return her medications immediately.

### C. Damages

To prevail on her claim for compensatory damages under the ADA, a plaintiff must show that the defendant violated her rights under the ADA with discriminatory intent. McCullum

v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1146-
47 (11th Cir. 2014). A plaintiff may show that the defendant
acted with discriminatory intent "by showing that a defendant
was deliberately indifferent to his statutory rights." Id. at
1147 (citing Liese v. Indian River Cty. Hosp. Dist., 701 F.3d
334, 345 (11th Cir. 2012)).

Deliberate indifference requires more than gross
negligence. To establish deliberate indifference, a plaintiff
must show that the defendant "*knew* that harm to a federally
protected right was substantially likely" and "*failed* to act
on that likelihood." Liese, 701 F.3d at 344 (quotation marks
omitted)(emphasis in original). "Where the substantial
likelihood of harm is obvious, a jury may infer that the
defendant had actual knowledge of that substantial risk of
harm." McCullum, 768 F.3d at 1147 (citing Farmer v. Brennan,
511 U.S. 825, 842 (1994)).

Deliberate indifference cannot be shown based on the
actions of any employee of a public entity. Rather, such a
showing requires "an official who at a minimum has authority
to address the alleged discrimination and to institute
corrective measures on the [organization's] behalf [and who]
has actual knowledge of discrimination in the
[organization's] programs and fails adequately to respond."

41

Liese, 701 F.3d at 349 (quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (2012)). The requirement that "there be an official is separate from the requirement that the official have the knowledge of and authority to correct an entity's discriminatory practices." Id.

The official does not have to be a policymaker in the organization. Id. at 349-50. "The question of how far up the chain of command one must look to find an 'official' is necessarily a fact-intensive inquiry, since an official's role may vary from organization to organization." Id. at 350. The key factor in determining whether an individual is an officer is whether he or she "is someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process." Id. The Eleventh Circuit explained that the "key decision point" language acknowledges "the practical reality that, while some decisions are technically subject to review by a higher authority, such a review is not part of the entity's ordinary decision-making process." Id.

Gualtieri notes that Sergeant Haisch had the authority to overturn bans or other decisions regarding residents'

access to Safe Harbor's services. (Gualtieri Dep. Doc. # 49-4 at 73:24-74:8; Haisch Dep. Doc. # 49-6 at 97:11-98:1). Haisch regularly reviewed the end-of-shift logs entered by Criminal Justice Specialists, in which CJS staff would note, among other things, the imposition of a ban or disciplinary action. (Haisch Dep. Doc. # 49-6 at 97:4-10). Thus, according to Gualtieri, CJS staff were not acting with complete discretion when they banned Alvey because Sergeant Haisch could reverse their decision.

But a genuine issue of material fact exists regarding the extent to which Sergeant Haisch exercised that authority. Although he would review a sleeping assignment made for disciplinary reasons, Sergeant Haisch acknowledged that he would not review "run-of-the-mill" changes in sleeping arrangements instituted by CJS staff, even though those changes also appear on the end-of-shift logs. (Haisch Dep. Doc. # 49-6 at 96:18-97:10). Alvey's assignment to a "boat" and the denial of her request for a bed were not made for disciplinary reasons. Taking the evidence in the light most favorable to Alvey, the CJS staff who denied her request for a bed were officials who enjoyed complete discretion in deciding whether to change a resident's sleeping arrangement or ban a resident.

43

If a reasonable jury finds that Gualtieri violated the ADA by failing to accommodate Alvey, then a reasonable jury could likewise find that Gualtieri acted with deliberate indifference by refusing to allow Alvey to use an empty bed in Pod 3, and subsequently banning Alvey from Safe Harbor after she was injured while attempting to stand up from her "boat." Cf. Clemons, 168 F. Supp. 3d at 1072 ("Given [plaintiff's] obvious need for an ADA compliant cell and the presence of those cells within the [jail], a reasonable juror could only find that the defendants acted with deliberate indifference and 'fail[ed] to act' upon the likelihood that [plaintiff] would be denied the access to the needed 'programs and services.'").

A reasonable jury could also find that Gualtieri's actions did not rise to the level of deliberate indifference towards Alvey's right under the ADA to be free from discrimination on the basis of her disability. Although the staff at Safe Harbor did not assign Alvey to a bottom bunk, they did assign her to a "boat," even though Alvey did not have the doctor's note typically required.

While a "boat" may not be a sufficient reasonable accommodation under the ADA's regulations, providing Alvey with a "boat" may convince a reasonable jury that Safe Harbor

staff did not deny Alvey a bottom bunk knowing that there was a substantial likelihood that Alvey's rights would be violated. Rather, a reasonable jury could infer that staff made a good faith effort to provide Alvey with the benefits of Safe Harbor's services, even if it finds that Safe Harbor did fail to reasonably accommodate Alvey. See Badillo v. Thorpe, 158 Fed. Appx. 208, 214 (11th Cir. 2005)("In other words, good faith attempts to pursue legitimate ends are not sufficient to support an award of compensatory damages under [the ADA].")(internal quotations omitted).

Regarding the ban placed on Alvey, reasonable minds could differ over whether Alvey was qualified to stay at Safe Harbor and whether Safe Harbor's criteria regarding medical fitness were necessary for the provision of Safe Harbor's services. See 28 C.F.R. § 35.130(b)(8). As a reasonable jury could conclude that the ban on Alvey as medically unfit for Safe Harbor was not unlawful discrimination under Title II of the ADA, a reasonable jury could conclude that Safe Harbor staff did not act with deliberate indifference towards Alvey's right to be free from discrimination on the basis of her disability when it banned her.

As a reasonable jury could find either that Gualtieri did or did not act with discriminatory intent, summary judgment is precluded as to compensatory damages.

## IV.  Conclusion

Genuine issues of material fact remain regarding whether beds were available at Safe Harbor when Alvey was assigned to a "boat" and later banned from the facility. Another genuine issue of material fact exists as to whether the provision of a "boat" for Alvey was a reasonable accommodation, regardless of bed availability. Furthermore, there is a genuine issue of material fact whether Alvey, if provided with the reasonable accommodation of a bottom bunk, would have been "medically fit" to stay at Safe Harbor after she returned from the hospital.

Finally, there remains a genuine issue of material fact whether, if Safe Harbor did fail to reasonably accommodate Alvey, it did so with discriminatory intent. Therefore, both Alvey's Motion for Partial Summary Judgment and Gualtieri's Motion for Summary Judgment are denied.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Plaintiff Amber Alvey's Motion for Partial Summary Judgment (Doc. # 49) is **DENIED.**

46

(2)   Defendant Bob Gualtieri's Motion for Summary Judgment

(Doc. # 50) is **DENIED**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this

7th day of November, 2016.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE